Bette L. GROFF, Administratrix of the Estate of Thomas Eric Zimmerman, Deceased, and in her own right, Plaintiff,

v.

The CONTINENTAL INSURANCE COMPANY, Defendant.

Civ. A. No. 89–3250.

United States District Court, E.D. Pennsylvania.

June 29, 1990.

5. Defendants do not dispute that plaintiffs can satisfy the amount of controversy requirement of Section 1332.

Kent D. Mikus, Lancaster, Pa., for plaintiff.

Frank A. Baker, III, Bethlehem, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Once again, this court is asked to resolve a dispute between insured and insurer concerning Pennsylvania law governing uninsured motorist coverage.[1] In this civil action, plaintiff Bette L. Groff ("Bette Groff"), administratrix of the estate of Thomas Eric Zimmerman ("Eric"), deceased, and in her own right, seeks a declaration that defendant The Continental Insurance Company ("Continental") is obligated to pay as much as $28,000,000 in uninsured motorist coverage to Groff. Groff's complaint can be reduced to two issues: (1) whether Continental's insureds, Bette Groff and her husband, effectively reduced their uninsured motorist coverage from $1,000,000 to $35,000; and (2) whether stacking is permitted under Continental's policy for each of the 28 vehicles, including 27 commercial vehicles, in the insureds' fleet.[2] The latter question

---

1. Uninsured motorist coverage provides "protection for persons who suffer injury arising out of maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of uninsured motor vehicles." *See* 75 Pa.C.S.A. § 1731(b).

2. I note that the complaint raises an issue concerning an insured's ability to recover punitive damages as a part of an award of uninsured motorist coverage. While Continental addresses this issue in its motion for summary judgment, plaintiff has failed to pursue this issue. Therefore, I decline to address this issue herein.

presents a question of law, while the former requires an application of certain facts to the law.

The parties have agreed that this action can be resolved by cross-motions for summary judgment which have been filed. For the reasons stated below, I will grant each motion in part and deny each motion in part. Specifically, I conclude that an uninsured motorist coverage limit of $35,000 applies to the Groffs' policy with Continental. However, I also conclude as a matter of law that stacking is permitted under the policy for each of the commercial vehicles insured by Continental's policy, and Pennsylvania law does not prohibit the stacking of uninsured motorist coverage under commercial fleet policies.[3]

### I.

As is often the case in disputes of this nature, a tragic set of circumstances gives rise to this action. On November 6, 1988, while operating a 1977 Chevrolet Chevette, Eric was killed, at the age of twenty, when his vehicle was struck by a vehicle driven by a drunk driver. Neither the driver, William M. Rohrer, Jr., or the owner, Robert J. Heisley, of the vehicle which struck Eric's vehicle carried automobile liability insurance or self-insurance as required by law.[4]

At the time of the accident, Eric was operating an automobile owned by his natural mother, Bette Groff, and his stepfather, Raymond Groff, with their permission. Also, Eric was living with Bette and Raymond Groff at the time of the accident.

Since before 1974, Raymond Groff operated a sole proprietorship,[5] known as Raymond C. Groff Busing, which provided transportation for special education and handicapped school children. When she married Raymond Groff, Bette Groff began to participate actively in the business. On November 6, 1988, the Groffs' business owned a fleet of 27 commercial vehicles, comprised of school vans and buses, and one private passenger automobile. Other than the private passenger vehicle, all vehicles were painted "school bus yellow" or equipped with a "Raymond C. Groff Busing" sign on the door. Including substitute drivers, the Groffs' business employed between 25 and 30 persons.

From February 26, 1988 to February 26, 1989, the Groffs insured the business' vehicles and their 1977 Chevrolet Chevette with Continental as a part of a single policy. Both Bette and Raymond Groff were listed as "named insured" on the policy. On the date of Eric's death, the vehicle driven by Eric and owned by Bette and Raymond Groff was insured by Continental as part of a "Business Auto Policy." At the same time, the policy also insured 27 commercial vehicles, school vans and buses.

This policy period was the first time that the Groffs were insured by Continental.[6]

---

To the extent that this controversy still exists, it should be raised during the uninsured motorist arbitration in the first instance.

**3.** The exact amount of uninsured motorist coverage to which plaintiff is entitled shall be determined in mandatory arbitration proceedings.

**4.** Pursuant to the definition of "uninsured motor vehicle" contained in 75 Pa.C.S.A. § 1702 and the insurance policy at issue in this case, the vehicle which struck Eric's vehicle was uninsured.

**5.** During her deposition, Bette Groff characterized the business as a partnership. This is not consistent with the record. Raymond Groff started the business prior to his marriage to Bette Groff. On the tax forms submitted by the Groffs for the 1987 and 1988 tax years, the business is clearly designated as a "sole proprie-

torship" operating under the name of "Raymond C. Groff." However, this distinction is not material to resolution of the issues before the court.

**6.** The Groffs utilized the Robert C. Stirling, Inc. ("Stirling") agency for the purpose of obtaining insurance coverage for their personal and business vehicles. Each year, Stirling would obtain the most reasonably priced insurance for the Groffs. Prior to 1988, Stirling obtained insurance for the Groffs with Federal Kemper Insurance Company and Utica Mutual Insurance Company. For each of the six years prior to 1988, the Groffs' commercial fleet policies provided coverage of $1,000,000/$1,000,000 for liability coverage and a single $35,000 limit for uninsured motorist coverage. Each year, according to representatives of Stirling, someone from Stirling reviewed the policy and coverages with the Groffs.

Because this was the first year that Continental insured the Groffs, Continental issued the policy, as evinced by the declaration sheet, with $1,000,000 of uninsured motorist coverage as required by Pennsylvania law.[7] In addition, the initial premium charged was equivalent to that required for $1,000,000 of uninsured motorist coverage.

On February 26, 1988 or April 26, 1988,[8] Raymond Groff signed a "Pennsylvania Supplemental Automobile Application." The form signed by Raymond Groff provides in pertinent part:

### PENNSYLVANIA SUPPLEMENTAL AUTOMOBILE APPLICATION

### MOTOR VEHICLE FINANCIAL RESPONSIBILITY LAW

The existing No–Fault law has been repealed and replaced by the Motor Vehicle Financial Responsibility Law. You will be provided with the following mandatory coverages:

\*    \*    \*    \*    \*    \*

**Uninsured/Underinsured Motorists Coverage** Uninsured/Underinsured Motorists Coverage will be afforded at the Bodily Injury limits on your policy. You have the option to select lower limits in writing. If you wish to select lower limits, please indicate below.

| Single Limit | | Split Limit | | |
|---|---|---|---|---|
| — | $ 35,000 (Basic) | — | $ 15,000/$ 30,000 | (Basic) |
| — | 50,000 | — | 20,000/ 40,000 | |
| — | 75,000 | — | 25,000/ 50,000 | |
| — | 100,000 | — | 50,000/ 100,000 | |
| — | 200,000 | — | 100,000/ 200,000 | |
| — | 300,000 | — | 100,000/ 300,000 | |
| — | I have selected lower limits as indicated above. | | | |

7. Unless an insured elects a lower amount of uninsured motorist coverage in writing, the insurer must provide the insured with uninsured motorist coverage equal to the amount of coverage for bodily injury. *See* 75 Pa.C.S.A. 1731(a).

8. The exact date the form was signed is not known. However, it was either of these two dates. Because both dates are before the death of Eric, this distinction is not material to the dispute between the parties. Further, the Groffs paid premiums for only $35,000 worth of uninsured motorist coverage for the entire policy period.

On the form, the box for a single limit of $35,000 for uninsured and underinsured motorist coverage was checked; however, the box below next to "I have selected lower limits as indicated above" was not checked. With the exception of the signature of Raymond Groff, the form was prepared by a representative of Stirling.

Because of a recent stroke, Raymond Groff has no recollection of signing the form or having any discussions with a Stirling representative concerning uninsured motorist coverage. However, Raymond Groff acknowledges that his signature is on the form and that he never signed anything without knowing what it was. Bette Groff did not sign a similar document. Nor does she have any recollection of seeing her husband sign the form or having any discussions with representatives of Stirling concerning uninsured motorist coverage.[9] Representatives of Stirling maintain that Bette Groff was present when Raymond signed the "Pennsylvania Supplemental Automobile Application."

Subsequently, on or about March 22, 1988, the declaration sheet of the Groffs' policy was manually changed by Continental. The previously typed in amount of $1,000,000 for uninsured motorist coverage was crossed out and the amount of $35,000 was written beside it. While Bette Groff cannot recall whether she received the revised declaration sheet, it is addressed to both her and her husband as named insureds.[10]

As a result of the election, the Groffs received a $1,912.04 credit against their premium. Also, the policy was amended by endorsement as follows:

9. According to the deposition testimony, Bette Groff handled all insurance aspects of the business. Bette Groff testified at her deposition that her sole concern was that the insurance policy provide for "a million, a million" coverage. However, she did not understand what this meant. She did not review the insurance policy or the declaration sheet except to make sure she had sufficient coverage and to check the premium charged.

10. She did testify that she looked at the papers that came in regarding the policy. However, she ordinarily just scanned them before placing them in the appropriate file.

In consideration of a return premium of $1,982 the policy is hereby amended as follows:

UNINSURED MOTORISTS LIMIT OF LIABILITY—$35,000 Per Pennsylvania Supplemental Automobile Application—Form G–33923–F made part of the policy.

This endorsement is dated effective April 26, 1988. Subsequent forms adding and deleting vehicles from the Groffs' policy list the uninsured motorist coverage limit as $35,000.

According to the declaration sheet of the policy, Continental provided uninsured motorist coverage for "Class 6" vehicles. Class 6 vehicles are described as follows:

OWNED AUTOS SUBJECT TO A COMPULSORY UNINSURED MOTORIST LAW. Only those autos you own which, because of the law in the state where they are licensed or principally garaged, are required to have and cannot reject uninsured motorists insurance. This includes those autos whose ownership you acquire after the policy begins provided they are subject to the same state uninsured motorists requirement.

Further, the policy defines "auto" as "a land motor vehicle, trailer or semi-trailer designed for travel on public roads but does not include mobile equipment." Importantly, the declaration page contained symbols which distinguished between private and non-private passenger vehicles. *Compare* Class 3 [11] *with* Class 4.[12]

In respect to the limits of uninsured motorist coverage, the policy provides as follows:

1. Except as provided in the following paragraph, the most we will pay for all damages resulting from any one accident is the limit of UNINSURED MOTOR-ISTS INSURANCE shown on the declarations regardless of the number of covered autos, insureds, claims made or vehicles involved in the accident.

However, if bodily injury [13] is sustained in an accident by you or any family member,[14] and if there is more than one covered auto, our maximum limit of liability for all damages in any such accident is the sum of the limits applicable to each covered auto. Subject to our maximum limit of liability for all damages, the most we will pay for bodily injury sustained by an insured other than you or any family member is the limit of UNINSURED MOTORISTS INSURANCE shown on the declarations for the covered auto the insured was occupying at the time of the accident. This is the most we will pay regardless of the number of insureds, claims made, or vehicles involved in the accident.

## II.

▬ Federal courts sitting in diversity must ascertain and apply state law. *See Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When presented with a novel issue of law and applicable state precedent is absent, a federal court must predict how the highest court of the state would resolve the issue. *Prudential Property & Casualty Ins. Co. v. Pendleton*, 858 F.2d 930, 934 (3d Cir. 1988). In so doing, a federal court may examine all existing resources, including Restatements, law reviews and well-reasoned authority from other jurisdictions.

11. Class 3 vehicles are "Owned Private Passenger Autos Only." This classification includes:

Only the private passenger autos you own. This includes those private passenger autos whose ownership you acquire after the policy begins.

12. Class 4 vehicles are "Owned Autos Other than Private Passenger Autos Only." This classification includes:

Only those autos you own which are not of the private passenger type (and for liability coverage any trailers you don't own while attached to your power units you own). This includes those autos, not of the private passenger type, whose ownership you acquire after the policy begins.

13. "Bodily injury" means a "sickness or disease including death."

14. A "family member" is defined as "a person related to you by blood, marriage or adoption who is a resident in your household, including a ward or foster child."

*Kohr v. Raybestos–Manhattan, Inc.*, 522 F.Supp. 1070, 1074 (E.D.Pa.1981).

Since a federal case will often fall outside the scope of those precise issues to which the state's highest court has spoken, due regard, but not conclusive effect, should be given to decisional law of lower state courts. *Burke v. Maassen*, 904 F.2d 178, 182 (3d Cir. 1990); *see also McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980); *Fickinger v. C.I. Planning Corp.*, 556 F.Supp. 434, 438 (E.D.Pa.1982). In fact, the United States Supreme Court has stated:

> An intermediate appellate state court ... is datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*West v. A.T. & T. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940) (quoted in *Commissioner v. Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967)); *see also Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273–74 (3d Cir.1985) ("Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indications that the highest state court would rule otherwise."); *Adams v. Cuyler*, 592 F.2d 720, 725 n. 5 (3d Cir.1979) ("Federal courts ... may consider the pronouncements of state intermediate appellate courts as an indication of how the state's highest court would rule.), *aff'd*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981).

### III.

◼ The Pennsylvania Motor Vehicle Financial Responsibility Law ("PMVFRL"), 75 Pa.C.S.A. §§ 1701–1798, requires that an insurer provide uninsured motorist coverage in an amount equal to the bodily injury liability coverage unless the insured waives the requirement. *See* 75 Pa.C.S.A. § 1731(a). Section 1734 of PMVFRL provides that

> [a] *named insured* may request *in writing* the issuance of coverages under section 1731 ... in amounts less than the limits of liability for bodily injury but in no event less than the amounts required by this chapter for bodily injury. If the named insured has selected uninsured and underinsured motorist coverage in connection with a policy previously issued to him by the same insurer under section 1731, the coverages offered need not be provided in excess of the limits of liability previously issued for uninsured and underinsured motorist coverage unless the named insured requests in writing higher limits of liability for those coverages.

*See* 75 Pa.C.S.A. § 1734 [emphasis added].

Finally section 1791 of the PMVFRL specifies the form of notice which should be utilized by the insurer to explain the availability of coverages and the insured's right to select higher or lower amounts of coverage.[15] If the form is used, the in-

---

**15.** Section 1791 provides as follows:

It shall be presumed that the insured has been advised of the benefits and limits available under this chapter provided the following notice in bold print of at least ten-point type is given to the applicant at the time of application for original coverage or at the time the first renewal after October 1, 1984, and no other notice or rejection shall be required:

IMPORTANT NOTICE

Insurance companies operating in the Commonwealth of Pennsylvania are required by law to make available the following benefits for you, your spouse or other relatives or minors in your custody or in the custody of your relatives, residing in your household, occupants of your motor vehicle or persons struck by your motor vehicle:

(1) Medical benefits, up to at least $100,000.

(2) Income loss benefits, up to at least $2,500 per month up to a maximum benefit of at least $50,000.

(3) Accidental death benefits, up to at least $25,000.

(4) Funeral benefits, $2,500.

(5) As an alternative to paragraphs (1) through (4), a combination benefit, up to at least $277,500 of benefits in the aggregate or benefits payable up to three years from the date of the accident, whichever occurs first, subject to a limit on accidental death benefit of up to $25,000 and a limit on funeral benefit of $2,500.

sured's signature on the form creates a presumption that the signatory had "actual knowledge and understanding of the availability of ... benefits and limits [under PMVFRL] as well as the benefits and limits ... [the insured has] selected." *See* 75 Pa.C.S.A. § 1791. Moreover, once the insured voluntarily signs the waiver, the presumption is conclusive, and he or she cannot be heard to rebut it. *See Prudential Property & Casualty Ins. Co. v. Pendleton*, 858 F.2d at 936.

While not the mirror image of the form of notice contained in section 1791, the Pennsylvania Supplemental Automobile Application signed by Raymond Groff did advise the reader of the mandatory coverages for medical expenses, work loss benefits, and funeral expenses under Pennsylvania law. The form further advised the reader of additional benefits which were available, including the maximum medical expense benefit aggregate limit, the work loss benefit limit, the accidental death benefit limit, the funeral expense limit, and the combination benefit aggregate limit. This, in my opinion, satisfies each of the first five subsections of section 1791. In addition, the form signed by Raymond Groff advised the insured that uninsured and underinsured motorist coverage would equal the amount of the bodily injury limit unless a lower option was selected. Finally, the form listed the split and single limits available to the insured. This conveys the information required under subsection six of section 1791.

However, the form which Continental argues constitutes a written election of lower uninsured motorist coverage benefits is not the form of notice suggested by the Pennsylvania legislature in section 1791. Aside from not being identical to the form of

notice contained in section 1791, the Pennsylvania Supplemental Automobile Application is deficient in two significant respects. First, the form lacked the words "IMPORTANT NOTICE" as required by section 1791. Second, the form did not contain the following sentence: "Your signature on this notice or your payment of any renewal premium evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected." Without these items, it would be improper to presume conclusively that Raymond Groff elected for the lower uninsured motorist coverage pursuant to section 1791.

■ Absent the existence of a conclusive presumption under section 1791, the insurer must establish that the insured knowingly and intelligently waived the benefit of higher uninsured motorist protection in writing. *See Johnson v. Concord Mutual Ins. Co.*, 450 Pa. 614, 300 A.2d 61, 64–65 (1973). I conclude that plaintiff has failed to create any genuine issue of material fact which would suggest that Raymond Groff did not intelligently and knowingly make an election of a lower level of uninsured motorist coverage.

■ Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ettinger v. Johnson*, 556 F.2d 692 (3d Cir. 1977). The facts must be viewed in the light most favorable to the opposing party,

---

(6) Uninsured, underinsured and bodily injury liability coverage up to at least $100,000 because of injury to one person in any one accident and up to at least $300,000 because of injury to two or more persons in any one accident or, at the option of the insurer, up to at least $300,000 in a single limit for these coverages, except for policies issued under the Assigned Risk Plan. Also, at least $5,000 for damage to property of others in any one accident. Additionally, insurers may offer higher

benefit levels than those enumerated above as well as additional benefits. However, an insured may elect to lower benefit levels than those enumerated above. *Your signature on this notice or your payment of any renewal premium evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected.*
*See* 75 Pa.C.S.A. § 1791 [emphasis added].

and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512.

Without question, Raymond Groff signed the form which checked a single limit of uninsured motorist coverage in the amount of $35,000. According to representatives of Stirling, the levels of coverage available under the Continental policy were explained to the Groffs, as in prior years. Also, uninsured motorist coverage in general was explained to the Groffs in an earlier year. Raymond Groff himself testified that he never signed anything without knowing what it was.

Plaintiff's only response to this evidence is that neither Bette or Raymond Groff remember making the election for lower coverage or recall discussing uninsured motorist coverage with any representative of Stirling. This lack of memory or knowledge alone is insufficient to create a genuine issue of material fact as to whether Raymond Groff made a knowing and intelligent election for lower uninsured motorist coverage. Therefore, the evidence presented by Continental on this issue remains uncontradicted.

Moreover, the evidence of events which occurred prior to and after the election by Raymond Groff support the conclusion that Raymond Groff acted knowingly and intelligently. First, for several years previous-

ly, the Groffs obtained the same level of uninsured motorist coverage, a single $35,000 limit, from other companies—Federal Kemper Insurance Company and Utica Mutual Insurance Company. Second, the Groffs only paid the premium for the lower amount of uninsured motorist coverage. In fact, they received a reduction in their premium reflecting Raymond Groff's election of lower coverage. Third, the Groffs never questioned the level of their uninsured motorist coverage, after receiving the endorsement amending the policy and incorporating the Pennsylvania Supplemental Automobile Application signed by Raymond Groff into the policy by reference. Finally, when the Groffs added vehicles to their insurance during the policy period, the forms they received from Continental also noted that the uninsured motorist coverage was a single $35,000 limit.

■ While I conclude that Raymond Groff made a knowing and intelligent election in writing for lower uninsured motorist coverage, the same cannot be said of Bette Groff. No such written election was signed by Bette Groff. Because Bette Groff was a named insured on the policy, her status was equal to that of her husband and any reduction of uninsured motorist coverage in writing by him would not be effective as to her. *See Hepler v. Liberty Mutual Fire Insurance Co.*, No. 3528 (Cumberland County Court of Common Pleas March 2, 1989); *see also* 75 Pa.C.S.A. § 1734 ("[a] named insured may request in writing the issuance of coverage under section 1731 ... in amounts less than the limits of liability for bodily injury ...").

Therefore, if Bette Groff had been injured in an accident caused by an uninsured motorist during this policy period, she might have been entitled to a single limit of uninsured motorist coverage in the amount of $1,000,000.[16] *See Hepler*. However, the case presented here is somewhat different—the person entitled to unin-

---

**16.** Continental's argument that Raymond Groff's election for lower uninsured motorist coverage is effective as to Bette Groff because this business auto policy covered a sole proprietorship or, if Bette Groff's account of the business rela-

tionship were accepted as true, a partnership is without merit, because the policy lists Raymond and Bette Groff as named insureds—not the business.

sured motorist benefits, Eric, is an insured, not a named insured, under the policy. Consequently, I am faced a situation in which one named insured has made an effective election for lower uninsured motorist coverage and another named insured has not. In order to resolve this ambiguity in the contract, I will consider extrinsic evidence to determine the amount of coverage which would be available to Eric, an insured. *See Celley v. Mutual Benefit Health & Accident Ass'n*, 229 Pa.Super. 475, 324 A.2d 430, 435 (1974) (parol evidence may be used to explain an ambiguity in a contract but not to change or alter the contract).

Based upon the circumstances of this case, I conclude that Eric is not entitled to the benefit of the higher uninsured motorist coverage limit. The Groffs paid a premium for the lower limit. All their conduct, prior to and after the time this policy became effective, suggests that they desired the lower limit in order to reduce their overall premium as much as possible. Certainly, neither Raymond or Bette Groff objected when they received documents concerning their policy which listed the limit of uninsured motorist coverage as $35,000. Therefore, Continental should not be forced to shoulder the burden of paying an amount of coverage higher than that intended by either of the parties. And Eric's estate should not be entitled to receive such a windfall when Continental had only an affirmative obligation to obtain written elections from named insureds.

## IV.

Before moving onto the question of stacking, I must briefly discuss some fundamental principles of contract construction.

"It is of course hornbook law that the interpretation of contractual provisions is in the first instance for the court." *Johnson v. Bensalem Township*, 609 F.Supp. 1340, 1342 (E.D.Pa.1985) (citing *Brokers Title Co., Inc. v. St. Paul Fire & Marine Insurance Co.*, 610 F.2d 1174, 1178 (3d Cir.1979)). "[A]mbiguous writings are interpreted by the fact finder and unambig-

uous writings are interpreted by the court as a question of law." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n. 10 (3d Cir.1980). A contract is ambiguous if it (1) is reasonably susceptible to different constructions; (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning. *See Cury v. The Colonial Life Ins. Co. of America*, 737 F.Supp. 847, 853 (E.D.Pa. 1990); *International Union v. Mack Trucks, Inc.*, 733 F.Supp. 938, 947 (E.D.Pa. 1990). "Summary judgment is properly used for interpreting a contract whose terms are considered by opposing parties to be clear and unambiguous, despite the parties divergent views of what the agreement provided." *Goldinger v. Boron Oil Company*, 375 F.Supp. 400, 413 (W.D.Pa.1974).

Under Pennsylvania law, insurance policies are subject to the same general principles of construction. *See, e.g., St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir.1981) ("*St. Paul Fire*"); *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566–67 (1983) ("*Standard Venetian*"). If the language of an insurance policy is clear and unambiguous, a court must give the policy its plain and ordinary meaning. *Pennsylvania Manufacturers' Ass'n Ins. Co. v. Aetna Casualty & Surety Co.*, 426 Pa. 453, 233 A.2d 548, 551 (1967). Further, "a court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." *Spezialetti v. Pacific Employers Ins. Co.*, 759 F.2d 1139, 1142 (3d Cir.1985) (citing *St. Paul Fire*, 655 F.2d at 524). If unambiguous, the court may interpret the policy as a matter of law. *Standard Venetian*, 469 A.2d at 566. However, all ambiguities found in the language of the policy must be resolved in favor of the insured. *Id.; see also Mohn v. American Casualty Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974); *Sykes v. Nationwide Mutual Ins. Co.*, 413 Pa. 640, 198 A.2d 844 (1964).

The language of the Continental policy relating to stacking is unambiguous. As quoted above, "if bodily injury is

sustained by you or any family member, and if there is more than one covered auto, our maximum limit of liability for all damages in any such accident is the sum of the limits applicable to each covered auto." This passage clearly permits stacking. It does not draw any distinction between private passenger and non-private passenger autos. If Continental wanted to prohibit stacking for commercial or non-private passenger autos, the policy could have been drafted to accomplish this end. The declaration sheet clearly contains categories of vehicles which draw distinctions between private passenger and non-private passenger vehicles. Because there is no ambiguity in the policy language, I conclude as a matter of law that stacking is permitted for all insured vehicles, non-private passenger and private passenger, owned by the Groffs, by the terms of the policy.[17]

However, "[i]nsurance contracts are presumed to have been made with reference to substantive law, including applicable statutes in force, and such laws enter into and form a part of the contractual obligation as if actually incorporated into the contract." *Clairton City School Dist. v. Mary*, 116 Pa.Commw. 376, 541 A.2d 849, 851 (1988). Consequently, if Continental correctly argues that stacking is not permitted under Pennsylvania law for commercial fleets insurance policies, then I may reform the contract to prohibit stacking for each of the 27 commercial vehicles insured by Continental at the time of Eric's tragic death. Resolution of this issue, however, requires a summary of Pennsylvania law in respect to uninsured motorist coverage involving commercial fleet policies.

This question was first addressed by the Pennsylvania Supreme Court in *Utica Mutual Ins. Co. v. Contrisciane*, 504 Pa. 328, 473 A.2d 1005 (1984) (*"Utica"*). In *Utica*,

the executrix of decedent's estate filed an action claiming entitlement to uninsured motorist benefits under a commercial fleet policy and a personal automobile insurance policy.[18] The decedent was a passenger in an insured vehicle at the time of the accident.

The court identified three classes of insureds as follows:

(a) The named insured and any designated insured and, while residents of the same household, the spouse and relatives of either,

(b) Any other person while occupying an insured highway vehicle; and

(c) any person with respect to damages he is entitled to recover because of bodily injury to which [the] insurance applies sustained under (a) or (b) above.

*Id.* at 338, 473 A.2d at 1012. These classifications appear in most uninsured motorist policies, and have been referred to as "class one," "class two," and "class three" insureds. *Id.*

Because the decedent was merely a passenger of the vehicle insured under the commercial fleet policy, he was a "class two" insured. The *Utica* court explained the significance of this classification as follows:

In this case, decedent's entitlement to coverage was predicated on his occupation of the vehicle at the time of the accident: a "class two" type of coverage. A claimant whose coverage is solely a result of membership in this class has not paid premiums, nor is he a specifically intended beneficiary of the policy. Thus, he has no recognizable contractual relationship with the insurer, and there is no basis upon which he can reasonably expect multiple coverage.

**17.** Continental argues that I should not permit stacking because it did not intend to provide stacking in this context. Also, Continental argues that it should not be obligated to stack uninsured motorist coverage in this instance, because the Groffs paid a premium which did not take into account the possibility of stacking. However, this extrinsic evidence cannot be used to contradict the plain meaning of the policy. *See Celley*, 324 A.2d at 435.

**18.** Because the decedent was a "class one" insured, although not a named insured, under his father's policy, the court permitted a stacking of uninsured motorist coverage for each of the three vehicles covered by that policy. *Id.* 504 Pa. at 339–42, 473 A.2d at 1011–12. *See also State Farm Mutual Auto. Ins. Co. v. Williams*, 481 Pa. 130, 392 A.2d 281 (1978); *Harleysville Mutual Ins. Co. v. Blumling*, 429 Pa. 389, 241 A.2d 112 (1968).

Since the decedent here asserted nothing more than "class two" coverage, his entitlement arose from his temporary status as an occupant, rather than from his being a specifically intended beneficiary of the insurance policy. Therefore there is no basis upon which to allow his estate to stack the coverages applicable to the other vehicles, and his recovery under the Utica policy is limited to the 15,000 dollar coverage applicable to the vehicle he was operating.

*Id.* at 338–39, 473 A.2d at 1010–11 (footnotes omitted).

The court in *Utica* expressly left the "questions of whether a 'class one' insured may stack coverages under a fleet policy, and whether the owner and/or officers of a corporation are 'class one' insureds under a policy issued in the name of the corporation." *Id.* at 338, 473 A.2d at 1010 n. 4.

In the context of commercial fleet policies, this issue was addressed by the Pennsylvania Superior Court on several occasions. First, in *Providence Washington Ins. Co. v. Rosato*, 328 Pa.Super. 290, 476 A.2d 1334 (1984), the estate of the decedent attempted to recover uninsured motorist coverage under a motorcycle dealer's garage fleet policy. At the time of her death, the decedent was riding as a passenger on one of the ten motorcycles that comprised the garage fleet. Examining the issue under the predecessor of PMVFRL,[19] the court determined that an anti-stacking clause in the policy was "clearly invalid and [could] not be enforced to preclude stacking." *Id.* at 296, 476 A.2d at 1337. However, the court also concluded, relying on *Utica*, that the decedent was a "class two" insured not entitled to stack uninsured motorist coverage. *Id.* at 298, 476 A.2d at 1339.

Two years later, another panel of the Superior Court dealt with a similar issue in *Miller v. Royal Ins. Co.*, 354 Pa.Super. 20, 510 A.2d 1257 (1986), *aff'd per curiam*, 517 Pa. 306, 535 A.2d 1049 (1988) ("*Miller*"). On this occasion, a panel of arbitrators and the lower court approved the stacking of uninsured motorist coverages under a commercial fleet policy based upon the fact that the injured party was a "class one" insured. The Superior Court reversed, stating:

> The court below determined that appellee is a class one insured. We agree, however, this classification becomes irrelevant in light of our determination that coverages under a fleet policy may not be stacked.

\*       \*       \*       \*       \*       \*

> One of the most common reasons for denying stacking of fleet policies is that such policies potentially cover a multitude of vehicles. It is argued "that to allow stacking would be to make premium costs prohibitively expensive and would not be within the reasonable expectations of the insurer and the employer-policyholder...." ... *If the insured-employer ... wanted additional protection against uninsured motorists, it was free to contract for the protection with its insurer, Royal. It declined to do so. We will not rewrite the insurance contract to permit stacking in this instance.*

*Id.* at 22–23, 510 A.2d at 1258–59.

Three subsequent Superior Court cases purportedly followed the reasoning of *Miller*. In *Boris v. Liberty Mutual Ins. Co.*, 356 Pa.Super. 532, 515 A.2d 21 (1986) ("*Boris*"), the court concluded that plaintiff, not a "class one" insured, could not stack uninsured motorist coverage under a corporate fleet insurance policy. Relying on *Miller*, the court stated that "a contrary finding would make premium costs prohibitive and that such stacking is not within the reasonable expectations of the parties to the agreement." *Id.* at 541, 515 A.2d at 26. Next, in *Thompson v. Royal Ins.*, 361 Pa.Super. 78, 521 A.2d 936 (1986), *appeal den.*, 520 Pa. 590, 551 A.2d 216 (1988) ("*Thompson*"), another appellate panel reached the same conclusion. The claimant, arguably a "class one" insured, sought

**19.** The Uninsured Motorist Law, 40 Pa.S.A. § 2000, was repealed on October 1, 1984 upon the enactment of the PMVFRL.

to stack uninsured motorist coverage under a commercial fleet policy. The court in *Thompson* stated:

> We find the reasoning employed in *Miller* to be dispositive of the instant case. Thus, assuming *arguendo* that Thompson was a class one insured, we conclude that she was not entitled to stack coverages.

*Id.* at 86, 521 A.2d at 940. Finally, the court in *Lastooka v. Aetna Ins. Co.*, 380 Pa.Super. 408, 552 A.2d 254, 255–57 (1988), *appeal granted*, 522 Pa. 613, 563 A.2d 498 (1989) (*"Lastooka"*) stated that stacking for non-private vehicles under a commercial fleet policy was not permitted, while concluding that stacking would be permitted for the five private passenger autos also covered by the same business auto policy.

Importantly, however, the Pennsylvania Supreme Court spoke to this issue only two months after the decision in *Lastooka*.[20] An injured volunteer fireman attempted to recover uninsured motorist coverage under the policy of the unincorporated volunteer fire association of which he was a member in *Selected Risks Ins. Co. v. Thompson*, 520 Pa. 130, 552 A.2d 1382 (1989) (*"Selected Risks"*). The Supreme Court concluded that the injured fireman could not stack uninsured motorist coverages under the "business auto policy" issued to the fire company. Writing for the court, Justice McDermott explained the court's decision as follows:

> [V]oluntary fire associations are in reality quasi-governmental units, and the policy issued by S.R.I. was essentially a fleet policy issued to a government unit. This Court recently affirmed the prohibition against allowing a non-designated individual to stack uninsured motorist coverage under a fleet policy, *Miller v. Royal Insurance Company*, 354 Pa.Super. 20, 510 A.2d 1257 (1986), *aff'd per curiam*, 517 Pa. 306, 535 A.2d 1049 (1988); and this prohibition against fleet stacking has been applied where the policy holder was a governmental unit. *See Flamini v. General Accident Fire & Life Assur-*

*ance Corp.*, 328 Pa.Super. 406, 477 A.2d 508 (1984). We detect no compelling reason to distinguish the current situation from those situations.

> Consequently, because the policy under which appellee sought coverage was a fleet policy with no explicit designation of insureds, appellee's entitlement to coverage was predicated on his occupation a vehicle: a "class two" status. Thus, appellee did not enjoy a recognizable contractual relationship with S.R.I. and there was no basis upon which to allow him to stack the coverages applicable to other vehicles.

*Id.* at 140–41, 552 A.2d at 1387.

Admittedly, this background information does not provide a crystal clear understanding of a person's ability to stack uninsured motorist coverages under commercial fleet policies, especially in light of the sweeping conclusions reached by some of the intermediate appellate court opinions summarized above. However, I conclude that, if presented with the specific circumstances of this case, the Pennsylvania Supreme Court would permit stacking of uninsured motorist coverages. I reach this conclusion for several reasons which I shall briefly explain below.

First, the Pennsylvania Supreme Court has *not* been totally silent on this issue. *See Selected Risks* and *Utica*. On neither occasion did the Court make the sweeping statement that "coverages under a fleet policy may not be stacked" as did *Miller* and its progeny. Despite being aware of the Superior Court decisions in *Miller*, *Boris*, *Thompson*, and, possibly, *Lastooka*, the Pennsylvania Supreme Court did not endorse the broad language of these cases in *Selected Risks*. Significantly, the classifications of insureds established by *Utica* and the reasoning of *Utica* were relied upon by *Selected Risks*. This would have been unnecessary, if the Court wished to follow the general prohibition purportedly established by *Miller*. This leads me to conclude that *Utica* is still proper law and the intermediate appellate court decisions

---

**20.** The Pennsylvania Supreme Court does not mention the appellate decision in *Lastooka*. Possibly, this opinion was not brought to the Court's attention.

on this issue should be disregarded to the extent that the diverge from *Selected Risks* and *Utica*. In *Utica*, the Court reserved the issue presented herein for another day.

Second, *Selected Risks* cited *Miller* only for a very narrow legal proposition. According to the Pennsylvania Supreme Court, *Miller* established a "prohibition against allowing a non-designated individual to stack uninsured motorist coverage under a fleet policy." *Selected Risks*, 552 A.2d at 1387. In this case, Eric was a designated individual. He was a "family member" entitled to recover uninsured motorist coverage under the policy if he suffered "bodily injury" as a result of the fault of an uninsured motorist. Therefore, restricting the holding of *Miller* to that attributed to it by the Pennsylvania Supreme Court, *Miller* does not bar stacking under the circumstances of this case.

Third, *Miller* is clearly distinguishable from the case at bar,[21] and a portion of the opinion supports plaintiff's attempt to stack uninsured motorist coverage in this case. The uninsured motorist endorsement in *Miller* reads as follows:

> Regardless of the number of covered autos, insureds, claims made or vehicles involved in the accident, the most we will pay for all damages resulting from any one accident is the limit of uninsured motorist insurance shown on the declarations.

*See* Exhibit 19 to Plaintiff's Motion for Summary Judgment. Clearly, the express language of the policy prohibits stacking and the injured party was seeking a reformation of the contract. *Miller* simply declined to do this and enforced the policy as written in unambiguous terms. Further, the *Miller* court stated "[i]f the insured-employer ... wanted additional protection against uninsured motorists, it was free to

contract for the protection with its insurer, Royal. It declined to do so. We will not rewrite the insurance contract to permit stacking in this instance." *Miller*, 510 A.2d at 1259.

In this case, stacking was permitted by the policy as written. Continental wrote the policy. Therefore, the company cannot claim surprise or unfair economic harm because it failed to charge sufficient premiums to take into account the possibility of stacking. The policy clearly could have been written to prohibit expressly the stacking of uninsured motorist coverages for commercial vehicles.

Fourth, there is nothing in the PMVFRL which would suggest that stacking is not permitted under commercial fleet policies. The undesirability of stacking on such policies from the stand point of the insurance company is obvious. However, a company which imposes contract language upon its customers should not be heard to complain later when the plain, unambiguous language of the policy which they drafted renders a conclusion which may not have been originally expected. Evidence of the intentions of the parties is inadmissible to contradict the plain meaning of the policy in this case—the policy clearly permits stacking for each of the covered autos insured by Continental at the time of the accident.

Finally, I conclude that, since Eric was a class one insured as defined by *Utica*, Eric's estate is entitled to stacking under the uninsured motorist coverage endorsement of the policy issued by Continental to Raymond and Bette Groff. While the Pennsylvania Supreme Court reserved judgment on this issue in 1984, I conclude that the result reached herein would be adopted by the court if faced with these circumstances today.[22] Unfortunately, I do

---

**21.** In fact, the same can be said of *Lastooka*. The uninsured motorist coverage endorsement in *Lastooka* prohibited stacking. *See* Exhibit 18 to Plaintiff's Motion for Summary Judgment. Therefore, *Lastooka* also presented a situation in which an individual was attempting to reform the policy to obtained coverage not provided for by the policy. While the exact policy language is not quoted in *Boris* and *Thompson*,

it is also possible that those cases arise under the same factual circumstance as *Lastooka*.

**22.** In *State Farm Mutual Auto. Ins. Co. v. Williams*, the Pennsylvania Supreme Court concluded that a named insured, who had already received the maximum coverage under his wife's uninsured motorist policy, to recover the remainder of his actual damages under his own

not have the luxury of waiting to see how the Pennsylvania Supreme Court will resolve this issue in *Lastooka.*

### V.

For the reasons stated above, I shall grant in part and deny in part the parties' cross-motions for summary judgment. A declaratory judgment which shall reflect this court's decision shall be entered in favor of plaintiff and against defendant.

An appropriate order follows.

### ORDER

Upon consideration of plaintiff's motion for summary judgment and defendant's motion for summary judgment, plaintiff's reply memorandum in support of her motion for summary judgment, defendant's reply memorandum in support of its motion for summary judgment, and for the reasons stated in the attached memorandum, it is ordered as follows:

(1) Plaintiff's motion for summary judgment is GRANTED IN PART. Plaintiff's motion for summary judgment is granted to the extent that it seeks a declaration from this court that stacking of uninsured motorist coverage is permitted under the Continental Insurance Company Business Auto Policy (No. LBA 3954472), in effect at the time of the death of Thomas Eric Zimmerman. In all other respects, plaintiff's motion is DENIED.

(2) Defendant's motion for summary judgment is GRANTED IN PART. Defendant's motion for summary judgment is granted to the extent that it seeks a decla-ration from this court that the Continental Insurance Company Business Auto Policy (No. LBA 3954472), in effect at the time of the death of Thomas Eric Zimmerman, provided for a single $35,000 limit of uninsured motorist coverage. In all other respects, defendant's motion is DENIED.

(3) It is hereby adjudged as follows: The Continental Insurance Company Business Auto Policy (No. LBA 3954472), in effect at the time of the death of Thomas Eric Zimmerman, with Raymond and Bette Groff as named insureds provided $35,000 uninsured/underinsured motorist coverage for each of the twenty-eight (28) vehicles covered by the policy on November 6, 1988. Further, the policy provided for the stacking of uninsured motorist coverage for each of the twenty-eight (28) vehicles covered by the policy on November 6, 1988.

(4) Judgment is entered in FAVOR of defendant and AGAINST plaintiff on the issue of the amount of uninsured motorist coverage provided for by the policy in effect at the time of the accident, and in FAVOR of plaintiff and AGAINST defendant on the issue of whether stacking was permitted under the policy.

IT IS SO ORDERED.

uninsured motorist policy. Thereafter, court's debated whether an unnamed insured would be entitled to the same benefit of stacking. In *Utica,* the Pennsylvania Supreme Court determined that such an individual was also entitled to stack coverages under his father's uninsured motorist policy. In so doing, the Court stated:

> Contrary to the assumption of Aetna, the criteria set out in *Williams* are not necessarily applicable to all claimants, in that they are not absolute conditions precedent to recovery in all cases. The Court in *Williams* merely defined one group of persons who are entitled to stack coverages, and nothing therein precludes us from extending the right to stack coverages to all persons within the "class one"

category of "insureds". We believe that such an extension is consistent with our decisions in *Harleysville, supra.,* and *Williams, supra.;* and that it comports with our decision above to condition a claimants' entitlement to stack on his status as a specifically intended beneficiary of the policy.

*Utica,* 473 A.2d at 1011. *See also Rosato v. Harleysville Mutual Ins. Co.,* 328 Pa.Super. 278, 476 A.2d 1328 (1984).

I see no reason why the reasoning of the above quoted portion of *Utica* should not be applied in the context of a commercial fleet policy when the person seeking recovery is a "class one" insured and intended beneficiary of the uninsured motorist coverage policy.