James SEBASTIAN, Plaintiff/Counter-defendant,

v.

**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendant/Counter-plaintiff.**

**No. CIV. AMD 97–205.**

United States District Court,
D. Maryland.

Sept. 27, 1999.

Peter J. McNamara, Howard B. Segal, Philadelphia, PA, Robert Welchek, Baltimore, MD, for plaintiff.

Bryan D. Bolton, Baltimore, MD, for defendant.

## MEMORANDUM

DAVIS, District Judge.

### I. Introduction

In this action, here under the diversity of citizenship jurisdiction, plaintiff James Sebastian has sued Provident Life and Accident Insurance Company, the company that has held his disability income insurance policy since 1987. Sebastian alleges that Provident breached the insurance contract by failing to pay him the disability benefits (exceeding $6,000 per month) he was entitled to receive during the period January 1, 1994, through August 1, 1995. He also contends that he is entitled to a refund of premium payments under the policy's waiver of premium provision and to reimbursement for all medical and rehabilitation expenses he has incurred in the course of his alleged total disability arising from a psychiatric disorder.

Provident has filed a counterclaim. It seeks to recover the value of the benefits it paid under the policy for the period August 1, 1995, through July 2, 1998, and a declaratory judgment that Sebastian's material breaches of the policy voids the policy. Specifically, it accuses Sebastian of fraud and willful misrepresentation in making his claim for benefits under the policy.[1]

---

1. In Count One, Provident seeks a declaratory judgment that Sebastian never had a total disability and that Provident was never obligated to provide benefits under the policy or waive premiums. Count Two of the counterclaim alleges breach of contract on the grounds that Sebastian made false representations about his ability to work in order to obtain disability benefits and seeks damages (i.e., repayment of benefits). Counts Three and Four allege breach of contract claims, each seeking a different remedy. In Count Three, Provident asks the court to declare the policy void and to order Sebastian to surrender the policy to Provident. In Count Four, Provident seeks an order declaring that the

Discovery has concluded; pending before the court are Sebastian's motion for summary judgment on the counterclaim and Provident's cross motion for partial summary judgment on several key issues. No hearing is necessary. For the reasons stated herein, I shall grant in part Provident's motion for partial summary judgment; I shall deny Sebastian's motion for summary judgment.

## II. Facts

The parties have dramatically divergent views of the facts and, more important, of the reasonable inferences that may be properly drawn from the facts that are supported by evidence in the record. Of course, each party, *qua* nonmovant, is entitled to have the facts (and the inferences arising from them) viewed in the light most favorable to his or its position on the competing motions for summary judgment.

Until late 1993, Sebastian operated Longwood Enterprises, Inc. ("Longwood"), a corporation that provided construction management and related services. Sebastian was the sole officer, shareholder and employee of Longwood. In 1993, Longwood's sole client was Joseph A. Bank Clothiers ("JAB"), for which Longwood acted as a general contractor in the construction of retail stores.

During late 1993, Sebastian began to feel ill; he was fatigued and unable to concentrate. By the end of 1993, he realized that he could no longer work. He began to wrap up his business affairs. By January 1994, Sebastian's company had completed its last project for JAB. Sebastian contends that he did not work or receive any employment-related income after January 1, 1994.

On deposition, Sebastian testified that his condition worsened over time. He described his condition as follows:

> Suddenly my arms and legs felt like lead .... It was like a giant toothache, a numbing .... I had a fractured elbow, which I left untreated for four weeks,

because every other thing was so painful that I ignored it. You interlock that with a mental ability to not seem to get the first step. We have all tried to write a term paper and couldn't get started. That was my life. What came so easy to me, what came in a flash, I could not get started. I am walking around with a fractured arm that I don't get set. I can barely move my arms and legs, and the thought of making a phone call was frightening because the first sentence would not come out. That set the stage. I worked self-employed since the early eighties. It's now fourteen years later, and I don't know how or who to call for help.

Sebastian Dep. at 67–68.

Dr. Edward P. Gorrie has been Sebastian's primary care physician since 1979. In 1982, Dr. Gorrie had begun prescribing medications for Sebastian to relieve bouts of anxiety and depression. When Sebastian called Dr. Gorrie on April 12, 1994, to report that something was wrong with him and that he felt "like crap," Dr Gorrie prescribed Valium to treat him for anxiety. Dr. Gorrie's practice of providing prescriptions by telephone to Sebastian (and without examining him or seeing him in person) was a common occurrence during 1994–95.

On September 13, 1994, Sebastian actually had an appointment with Dr. Gorrie and reported that he needed a stress management program instead of medication. Sebastian reported that he felt depressed and anxious. Dr. Gorrie diagnosed Sebastian with anxiety and depression and prescribed an antidepressant, Zoloft. Dr. Gorrie testified on deposition that he also advised Sebastian to seek care from a psychiatrist because he felt that Sebastian was not responding to the medications he had prescribed. Gorrie Dep. at 47. Sebastian does not recall Dr. Gorrie advising him to seek psychiatric help during the September 1994 visit and Dr. Gorrie's

policy has lapsed for nonpayment of the premium. Finally, Count Five alleges a claim

based on the doctrine of unjust enrichment and seeks restitution.

treatment notes do not reflect that he gave this advice.

In fact, Sebastian did not visit a psychiatrist until a year later, in September 1995. Up until then, the only treatment Sebastian received was in the form of taking the medications prescribed to him (as mentioned above, often by telephone and without an office visit) by Dr. Gorrie. In October 1994, Dr. Gorrie again prescribed Valium to combat Sebastian's anxiety and in August 1995, he prescribed Paxil, an antidepressant medication. Dr. Gorrie attests that he again advised Sebastian to see a psychiatrist in August 1995.

In September 1995, Sebastian remembered that he had a disability income insurance policy with Provident. He contacted his agent, Kevin Leshczynski, and informed him that he was sick. Leshczynski mailed the appropriate claim forms to Sebastian. Upon receipt of the forms, however, Sebastian ripped them up. He testified that he felt unable to cope with the fact that he was ill and needed help.

Soon thereafter, Sebastian sought treatment from Dr. William Hankin, a psychiatrist. Sebastian went to see Dr. Hankin on his own initiative; he selected Dr. Hankin because he was the only psychiatrist listed in the phone book in Cape May County, New Jersey, apparently near Sebastian's then home.

Dr. Hankin diagnosed Sebastian with "adjustment disorder with depressed mood." On deposition, he described Sebastian's illness as follows:

> When external events in a person's life are such that they produce the stresses and distress that causes a change in a person's mood state, and depending upon the person, they might have different reactions to the same set of stressors. Specifically, in this case, I felt that his blowup with his wife had led to his loss of interests and his other signs of depression, lack of energy, sleep disturbance, other factors that were all symptoms of a depressive reaction rather than an anxious reaction.

Hankin Dep. at 30. After only four visits, however, Sebastian terminated his relationship with Dr. Hankin. Sebastian felt that Dr. Hankin was not interested in helping him to get well; he was disturbed that Dr. Hankin interrupted his visits to accept phone calls from other patients.

On September 28, 1995, Sebastian returned to see Dr. Gorrie. He reported to Dr. Gorrie that he had seen a psychiatrist but felt that it was not helpful and had terminated the relationship. Dr. Gorrie referred Sebastian to Dr. Neil Cohn, a psychiatrist to whom he had made other referrals.

Sebastian began treatment with Dr. Cohn in November 1995. Dr. Cohn diagnosed Sebastian with bipolar affective disorder, a biologically based mental illness, and treated him with medications, including lithium, and he conducted weekly psychotherapy sessions. When Sebastian was deposed in August 1997, he was still under the care of Dr. Cohn.

Meanwhile, when Provident did not receive claim forms from Sebastian, it sent another set of forms to him in October 1995. With assistance from his son and a friend, Sebastian was able to complete the disability claim forms. On October 20, 1995, Provident received a **notice of claim** dated September 25, 1995. In the notice of claim, Sebastian advised that the nature of his sickness was "[m]ajor depression" and that he last worked on December 31, 1993.

Provident also received on October 20, 1995, an **insured's statement of claim** dated September 26, 1995. In this document, Sebastian represented that he was employed by XLS, Inc. (discussed below), that he had been completely unable to work since January 1, 1994, and that he last worked on December 31, 1993. Sebastian further represented that he had no income from employment after December 1993.

In early 1996, Provident began to pay disability benefits to Sebastian under a

reservation of rights. Specifically, in February 1996, Provident requested additional information and documentation from Sebastian and, pending receipt of the information and documentation, paid Sebastian benefits for the period of August 1, 1995 through February 1, 1996, less the 60 day elimination period. Provident explained that it was not using January 1, 1994, as the starting date of disability because Sebastian was not referred for treatment with a psychiatrist until August 1995. On February 26, 1996, the policy was placed on waiver of premium beginning with the annual premium that had been due on January 23, 1996. Sebastian instituted this action in early 1997, primarily challenging Provident's refusal to pay benefits for the January 1994 to August 1995 period.

In the course of discovery, Provident uncovered evidence that, during the period of his ostensible disability, Sebastian (1) played a significant role in the formation of a business corporation, XLS, Inc., that, seemingly, was successfully engaged in the very sort of construction services industry in which Sebastian formerly worked, and (2) received substantial payments, exceeding $940,000, from a business associate, and that many such payments had been funneled through the bank account of XLS, Inc.

Specifically, during the early stage of his illness, in May 1994, Sebastian incorporated XLS, Inc., in Delaware. He became the sole officer and shareholder of XLS. In July 1994, Sebastian and his son, James Sebastian, Jr., submitted a signature card and a resolution authorizing a corporate bank account for XLS. Sebastian signed the resolution as president of XLS; James, Jr., signed as vice-president, treasurer, and secretary of the corporation, although he denied on deposition that he was ever an officer of XLS. James Sebastian, Jr., Dep. at 141–42.

Even in the face of this evidence, Sebastian adamantly denies that he engaged in any actual work under the aegis of XLS. He testified that he started XLS only to help his son get a leg up in the construction services business:

> [XLS's] function was to get a little more away from the construction end of the construction services and a little more into the construction services end of the construction business.... Longwood was involved in building [stores] ... That is labor intensive, subcontractor, liars, people who lie, people don't show up on time, permits that don't arrive. That is what I did for twenty years or so .... Well, my son wanted to come into the business he was more into the electronic end of it, so we were developing his skills and hooking up audio, stereo systems for storage.
>
> As he was putting it together, I was to use my contacts and sales expertise to get the company going. He put it together, but I just couldn't. I just could not make the presentations. I just could not do it. It's a company that never got off the ground.

Sebastian Dep. at 24–25.

Sebastian asserts that XLS was never operational, but Provident has uncovered evidence suggesting otherwise. Between December 1994 and March 1997, XLS issued many checks to various people, including both Sebastian and his wife, and their son James, Jr. Many of these checks contain memos that they were "expense reimbursement[s]." Provident contends that these checks were written to cover business related expenses.

Provident also points to a tax return that was prepared for XLS. In December 1995, James Brogan, a certified public accountant who had prepared personal and business tax returns for Sebastian for many years, reviewed and signed a Form 1120S (U.S. Income Tax Return for an S Corporation) for XLS. The return had actually been prepared by Brogan's daughter, who was an associate at Brogan's accounting firm. The tax return was for the period May 20 (formation of XLS) through December 31, 1994; James, Jr., provided

the information on which the return was based.

The tax return reflects that during 1994, XLS had gross receipts or sales of $230,903; a gross profit of $68,140; total income of $68,180; total deductions of $61,667; and ordinary income from trade or business activities of $6,513. The cost of goods sold, $162,763, was based on labor costs of $95,695 and material and supply costs of $67,068. XLS's itemized deductions included deductions for insurance, postage and supplies, telephone, meals and entertainment. Moreover, a Schedule K–1 (Shareholder's Share of Income, Credits, Deductions, etc.) reflects that Sebastian received $6,513 in ordinary income from business activities.

It is not clear whether the tax return was ever filed. Moreover, James, Jr., offered benign explanations for some of the checks drawn on the XLS account.

Provident has also marshaled evidence which shows that between November 1994 and April 1997, XLS and/or Sebastian were paid over $940,000 by a firm called ROB Associates through a series of checks. ROB Associates is a construction consulting firm owned and operated by Richard Owen Bradley. Bradley has had a personal and professional relationship with Sebastian since 1978, but the record does not make clear the exact nature of that relationship.

On deposition and by affidavit, Bradley testified in essence that the payments to Sebastian were for the personal benefit of Sebastian simply because he needed money. Bradley Dep. at 47. Although many of the checks contained the memo "Consultation," Bradley denies that the payments to Sebastian were for consulting services. Bradley testified without explanation that he had simply given Sebastian unfettered access to funds in one or more of his investment accounts; he had his stockbroker deliver blank checks to Sebastian. When questioned about the "Consultation" memo appearing on the checks, Bradley testified as follows:

Q: What was the purpose of this check?

A: What was the purpose of it? The purpose of that check was because he needed money.

\* \* \* \* \* \*

A: I'm—I'm consulting, not him.

Q: So the remark in the memo section of Check No. 101 which says consultation, that's not true?

A: No. That's not true.

Q: Okay.

A: I think he thought I was seeing—seeing these checks. I never saw these checks. I think he thought it was joking with me. That's my feeling about it.

Q: And why do you say that?

A: Because he never—I never had consultations from Jim Sebastian.

\* \* \* \* \* \*

A: I'm 70 years old. What's he, 40 something? ... Forty-nine. Why would I need consultation from him?

*Id.* at 48–49.

During its ongoing administration of Sebastian's claim under the disability policy, Provident required Sebastian to submit supplemental statements of claim on a monthly basis; Sebastian submitted such documents, repeatedly attesting that he was disabled and unemployed. When Provident uncovered the information described above regarding XLS and the payments from Bradley, it notified Sebastian on July 2, 1998, that it was terminating his benefits. Thereafter, Provident sought and obtained leave to file its counterclaim, in which it seeks a declaration that the policy is void and to recover all monies paid under the policy.

### III. Summary Judgment Standards

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment should also be granted when a party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, on which the party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. However, "[s]ummary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy,* 929 F.2d at 1012.

When a court is confronted with cross-motions for summary judgment, as is the case here, the court must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed.1998). In the instant case, a careful review of the record establishes that there are genuine disputes of fact on several key issues.

## IV. Contentions of the Parties

Provident asserts that it is entitled to dispositive rulings in its favor as a matter of law on several key issues: (1) that Sebastian did not receive "appropriate care" by a physician during the period January 1, 1994, through August 1, 1995, and, therefore, was not totally disabled within the language of the policy; (2) that Sebastian failed to submit a timely notice of claim and proof of loss for the period January 1994 through June 1995, and, therefore, was not entitled to benefits during that period; (3) that as a matter of law Sebastian did not incur rehabilitative expenses; and (4) that Sebastian cannot recover the annual premium payments he made in January 1994 and 1995 because he was never totally disabled during the periods covered by those premium payments, and, therefore, the policy's waiver of premium provision never took effect.

Sebastian asserts that he is entitled to dispositive rulings in his favor as a matter of law on the following issues: (1) that he was "not able to perform the substantial and material duties" of his occupation beginning in January 1994; (2) that because

Provident did not reserve within the policy the right to recover benefit payments that it (or a court) later determines it was not obligated to pay, its attempt to recover those payments fails as a matter of law; and (3) that there is no evidence in the record sufficient to establish that he fraudulently obtained disability benefits and, therefore, Provident is not entitled to a declaratory judgment that the insurance contract is void, and that, in any event, Provident is estopped from seeking such relief.

I shall address these issues in turn, bearing in mind that the nonmovant as to each such issue is entitled to the benefit of all favorable reasonable inferences.

## V. Analysis [2]

### A. Total Disability

Under the insurance policy in suit, Provident agreed to pay benefits for "Total Disability." The policy states:

> Total Disability or totally disabled means that due to Injuries or Sickness:
> (1) you are not able to perform the substantial and material duties of your occupation; and
> (2) you are receiving care by a Physician which is appropriate for the condition causing the disability.

Provident contends that Sebastian's claim for benefits during the period January 1994 through August 1995 fails because, as a matter of law, he did not receive during that period "care by a [p]hysician which [was] appropriate for the condition causing [his] disability." Sebastian contends that a jury question is presented as to that issue. He also seeks a ruling as a matter of law that during the disputed period, he was "not able to perform the substantial and material duties of [his] occupation." As described below, summary resolution of neither of these issues is appropriate on the present record.

### 1. Appropriate Care by a Physician

■ The parties disagree over the proper interpretation of the term "appropriate care." Under Pennsylvania law, which is controlling here, insurance policies are construed like any other contract. *Groff v. Continental Ins. Co.*, 741 F.Supp. 541, 549 (E.D.Pa.1990)(collecting state and federal cases). "Where the language of the policy is clear and unambiguous, it must be given its plain and ordinary meaning." *Visiting Nurse Ass'n of Greater Philadelphia v. St. Paul Fire & Marine Ins. Co.*, 65 F.3d 1097, 1100 (3rd Cir.1995). A contract is not rendered ambiguous because the parties do not agree on the construction of its provisions. *See Tenos v. State Farm Ins. Co.*, 716 A.2d 626, 629 (Pa.Super.1998). Rather, an ambiguity only exists when a policy provision is reasonably susceptible to more than one meaning. *Id.* " '[A] court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them.' " *Groff*, 741 F.Supp. at 549 (*quoting Spezialetti v. Pacific Employers Ins. Co.*, 759 F.2d 1139, 1142 (3rd Cir.1985)). "Where ... a term is not defined in an insurance policy but possesses a clear legal or common meaning that may be supplied by a court, the contract is not ambiguous." *City of Erie, Pa. v. Guaranty Nat. Ins. Co.*, 109 F.3d 156, 163 (3rd Cir.1997).

■ In *Doe v. Provident Life & Accident Ins. Co.*, 1997 WL 799439 (E.D.Pa.

**2.** The parties are largely in agreement as to the allocation of their respective burdens of proof and that resolution of any issue concerning the construction of the insurance policy is governed by Pennsylvania law. They disagree as to whether Provident's unjust enrichment claim (as to which it seeks restitution) arises under Maryland law or, assuming Pennsylvania law is controlling, whether the outcome would be any different.

Provident focuses on restitution as a *remedy* and correctly contends that Maryland remedial law applies under *Erie* principles. *See Guinness PLC v. Ward*, 955 F.2d 875, 893 n. 13 (4th Cir.1992). Sebastian is not mounting an attack on Provident's request for a specific remedy, however, but rather, challenges the substance of Provident's claim of "unjust enrichment." I need not pause over this issue at this time, as the unjust enrichment claim is wholly redundant of the claim for fraud.

December 30, 1997), three disability insurance policies issued by Provident were in suit. Two of the policies contained a provision defining total disability which is identical to that contained in the policy at issue in this case. *Id.* at *1. The plaintiff requested the court to instruct the jury that care was "appropriate" within the meaning of the policy language " 'as long as the care would satisfy the standard of a reasonable physician under the circumstances.' " *Id.* at *4. Instead, the court instructed the jury that " '[a]ppropriate means suitable under the circumstances. It does not mean perfect care, or best possible care.' " *Id.*

At the conclusion of the trial, the jury found that plaintiff had proven by a preponderance of the evidence that he was not able to perform the substantial and material duties of his occupation during the period at issue; however, the jury concluded that plaintiff had failed to prove that he was receiving care by a physician which was appropriate for the condition he claimed was causing his disability. *Id.* at *2.

The parties filed post-trial motions, and in ruling on these motions, the court considered whether it had "erred by admitting [expert] evidence concerning the quality of care and by failing to instruct the jury that, as a matter of law, the care [plaintiff] received by his treating physicians was appropriate." *Id.* at *4.

The court reiterated its earlier view that the clause "care by a physician which is appropriate to the condition causing the disability" was not "ambiguous . . . misleading or beyond the understanding of an individual of average intelligence," *id.,* and concluded that the instruction given the jury complied with the mandate of Pennsylvania law requiring "that [unambiguous] language [of an insurance policy] be read by the jury in accordance with its plain and ordinary meaning." *Id.* I am persuaded by the reasoning of *Doe* and I shall employ that court's definition of "appropriate care."

Provident argues that the care Sebastian received from Dr. Gorrie was not appropriate because: (1) Sebastian saw and was examined by Dr. Gorrie only once during the period April 12 through September 12, 1994; (2) between October 11, 1994, and August 1, 1995, Sebastian neither saw nor spoke with Dr. Gorrie; and (3) Dr. Gorrie is not trained to treat mental illness on the same level as a psychiatrist and Sebastian's mental illness required a higher level of care.

Provident denigrates as not appropriate Dr. Gorrie's treatment of Sebastian because Dr. Gorrie prescribed anxiety and antidepressant medications without first examining Sebastian, and waited until September 13, 1994, to conduct a physical examination. Provident also argues that evidence of the inappropriateness of Dr. Gorrie's care is manifest in his misdiagnosis of Sebastian after the September 13 examination. Indeed, Provident seems to contend that the fact that Dr. Gorrie misdiagnosed Sebastian is sufficient evidence, standing alone, to establish as a matter of law that Sebastian did not receive appropriate care for the condition causing his condition. I reject these contentions as more appropriately reserved for the jury's consideration.

■ Unquestionably, because he was not under the care of *any* physician from January 1, 1994, to April 11, 1994, Sebastian is not entitled to benefits during that period and Provident's denial of benefits was consistent with the policy of insurance as a matter of law. On the other hand, whether Sebastian received "appropriate care" during the period April 12, 1994, through August 1, 1995, cannot be resolved on summary judgment. Viewing the facts, and drawing all inferences, in favor of Sebastian, I am persuaded that a reasonable jury could conclude that Sebastian received "appropriate care" even if he did not receive the "best possible" care for a disabling psychiatric disorder.

There is undisputed evidence in the record establishing that Sebastian was under

Dr. Gorrie's care at intervals during the April 1994 through August 1995 period. It is also undisputed that from April 12, 1994, to September 13, 1994, Sebastian maintained the treatment protocol prescribed by Dr. Gorrie: Dr. Gorrie's treatment notes from Sebastian's office visit on September 13, 1994, establish that Sebastian had continued taking the Valium prescribed to him by Dr. Gorrie on April 12. Evidence in the record also reflects that on Sebastian's visit to Dr. Gorrie on September 13, 1994, Sebastian asked to be placed on a stress management program to manage his illness; he no longer wanted to be treated with prescription medications. Dr. Gorrie examined Sebastian, diagnosed him with depression and anxiety and prescribed an antidepressant.

Between September 13, 1994, and August 1, 1995, Sebastian received numerous prescriptions for medication from Dr. Gorrie. Contrary to Provident's contention, there is evidence in the record establishing that Sebastian contacted Dr. Gorrie's office on several occasions and obtained prescriptions for medication to treat his "anxiety and depression."

Provident's contention that Dr. Gorrie's treatment protocol of prescribing Sebastian medications during this period was not "appropriate care" because Dr. Gorrie was not treating Sebastian for bipolar affective disorder does not justify or require resolution of this issue as a matter of law. To be sure, it is undisputed that Dr. Gorrie misdiagnosed Sebastian. Sebastian's expert and treating psychiatrist, Dr. Neil Cohn, testified that Sebastian had been suffering from bipolar affective disorder and that, had he been properly diagnosed, the treatment protocol would have been somewhat different. Cohn Dep. at 103.

Still, Dr. Cohn's testimony would support a jury finding that Dr. Gorrie's approach to treatment was minimally "appropriate." He explained that bipolar affective disorder affects an individual's mood. The "individual will have periods of increased energy and racing thoughts and lability of mood and unpredictable and erratic behavior mixed with periods of low energy and depression and poor concentration." *Id.* at 67. The disorder can be treated and managed with medications such as lithium and through psychotherapy; it cannot be cured.

Indeed, Dr. Cohn testified unequivocally that Dr. Gorrie rendered appropriate treatment during the period in question. Dr. Cohn explained that, while it was not the ideal treatment, the use of antidepressants was appropriate to Sebastian's condition. *Id.* at 71–76. He further explained that the initial misdiagnosis by Dr. Gorrie was not uncommon and that the misdiagnosis did not render the treatment inappropriate. He clarified his position, as follows:

Q: Despite your disagreement with Dr. Gorrie's assessment of Sebastian's condition, you still have confidence in Dr. Gorrie and believe that the treatment he was giving to Sebastian was appropriate for his bipolar affective disorder?

A: Yes, it was appropriate. I would like to make a clarification of that.

\* \* \* \* \* \*

The [distinction] between major depression and bipolar affective disorder is an extremely important distinction, and it makes a large difference in terms of the type of treatment someone should receive and the type of medication that one is going to benefit from. On the other hand, a fair number of psychiatrists and the vast majority of internists and family doctors will initially misdiagnose an individual of bipolar affective disorder as having major depression.

*Id.* at 102–03. Furthermore, Dr. Cohn indicated that Valium is often used to treat anxiety and bipolar affective disorder because it "can be effective in a treatment of a disorder in terms of alleviating some of the mood swings and actually modifying the positive direction the course of the illness." *Id.* at 104.

Viewing the record as a whole, therefore, I am persuaded that a reasonable jury could find that Sebastian received "appropriate care" for his disabling psychiatric disorder.[3] *Cf. Stamm v.Provident Life and Accident Ins. Co.,* 1998 WL 596700, *9 (N.D.Ill. September 2, 1998)(reliance on a chiropractor for diagnosis and treatment of a stress-related disorder "appropriate care" under disability policy).

### 2. Performance of Substantial and Material Duties of Occupation

█ Sebastian contends that the issue of whether he was "able to perform the substantial and material duties of [his] occupation" should be resolved as a matter of law in his favor. I disagree. Provident has a substantial evidentiary basis for its counterclaim and for its contention that Sebastian willfully and fraudulently covered up the fact that he remained actively employed in the construction services industry during the disputed period.

Sebastian claims that he did not work after December 1993 because he was too ill to work; there is substantial evidence to the contrary. Indeed, immediately following the dissolution of Longwood, Sebastian formed XLS. He was elected director of XLS. In July 1994, Sebastian opened a corporate bank account for XLS. More-over, a reasonable jury could find that between November 1994 and April 1997, ROB Associates paid Sebastian/XLS over $940,000 for such things as "Jan. Consultation," "Services Rendered," "Consultation," and so on. Furthermore, between December 1994 and March 1997, XLS issued checks to various persons for such things as "travel expenses," "expense reimbursement," "services rendered–1995," and "entertainment expenses." In 1995, corporate tax returns were prepared for XLS reflecting that, within a six month period after its inception, XLS had gross receipts or sales of over $230,00 and a gross profit of over $68,000. Finally, in October 1995, Sebastian reported in his statement of claim that his "employer" was XLS. Provident is clearly entitled to have a jury evaluate the import of this evidence.

To support his position, Sebastian points to his own testimony, in which he stated that: (1) he was unable to work because of fatigue and an inability to concentrate; (2) he formed XLS for his son; and (3) XLS was not a successful venture. Sebastian also relies on the testimony of Brogan and Bradley. Brogan testified that the XLS tax return was never filed because the corporation was phased out and that Sebastian was not listed on the return as an

---

**3.** Provident contends that Dr. Cohn's testimony with regard to the appropriateness of care is not sufficient to defeat its motion for partial summary judgment because the testimony would not be admissible at trial. Provident maintains that Dr. Cohn's testimony is not admissible because it is not based on a medical/scientific foundation but on his confidence and knowledge of Dr. Gorrie's past treatment of patients. Dr. Cohn testified as follows, in part:

Q: Would you render an opinion to a reasonable degree of medical certainty, assuming the facts that I just explained, the treatment given to Sebastian by Dr. Gorrie between January 1, 1994 and August 1, 1995, was appropriate treatment for Sebastian's condition?

A: Again, based on my knowledge of Dr. Gorrie, I would say yes, it was appropriate treatment.

Q: What is your knowledge of Dr. Gorrie that you are relying on?

A: That we have discussed patients in the past and that I felt that his knowledge of medicine, in general, was good and also that with this particular patient and other patients that he's referred to me, he's used appropriate medications and given patients appropriate information, that they then relayed to me about the nature of depression and its needed treatment.

Cohn Dep. at 73–74. But Dr. Cohn also testified that he relied for his opinion that Dr. Gorrie's treatment was appropriate on the latter's "use of appropriate medications to treat this condition." *Id.* at 71.

Clearly, Dr. Cohn did not rely exclusively on his knowledge of and confidence in Dr. Gorrie's treatment of other patients in concluding that Sebastian received appropriate treatment; Dr. Cohn's opinion has a foundation in his training and experience as a physician.

employee but as an officer and received no compensation. Brogan also testified that his firm dealt exclusively with James, Jr., because Sebastian was unable to concentrate and handle his affairs.

With regard to the checks XLS received from ROB Associates, Bradley testified that the monies paid were for Sebastian's personal use *precisely because* he was unable to work. Bradley testified further that the monies paid were not in consideration of any services provided by Sebastian, but the jury must assess the credibility of this assertion under the totality of the evidence. Bradley also testified that he was not aware of the notations made on the checks in reference to consultation. He adamantly denied that Sebastian did any consulting work for him, and he thought the memos on the checks were "a joke."

In sum, in view of the conflicting evidence (and related inferences reasonably arising therefrom) regarding whether Dr. Gorrie's treatment of Sebastian was appropriate and whether Sebastian was able to perform the substantial and material duties of his occupation, the issue of whether he was totally disabled remains an issue to be resolved at trial.[4]

C. Notice of Claim and Proof of Loss Provisions

Sebastian's policy provides as follows in part:

NOTICE OF CLAIM

Written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible.

PROOF OF LOSS

If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for

which we are liable. For any other loss, written proof must be given within 90 days after such loss.

If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.

TIME OF PAYMENT OF CLAIMS

After we receive written proof of loss, we will pay monthly all benefits then due you for disability. Benefits for any other loss covered by this policy will be paid as soon as we receive proper written proof.

There is no dispute that Sebastian's disability, if indeed it existed (or exists) was (and is) a "continuing loss" under the "proof of loss" policy provision, and that "the policy provides for periodic payment for a continuing loss." Provident contends, nevertheless, that Sebastian's failure to comply timely with the above conditions precedent regarding notice of claim and proof of loss forecloses his right to recover.

Provident contends that it was reasonably possible for Sebastian to submit written notice of claim and proof of loss well before October 1995. Provident contends further that since the policy provided for the monthly payment of benefits, Sebastian was obligated to submit a separate proof of loss within 90 days after *each month* for which he claimed Provident was liable to pay him benefits. In other words, according to Provident, for the month of April 1994, Sebastian was required to give written proof of loss within 90 days of

4. The applicable waiver of premium provision in the policy provides:
 If, during a period of disability, Injuries or Sickness results [sic] in more than 90 days of Total and/or Residual Disability, we will:
 1. refund any premiums which became due and were paid while you were so disabled; and

2. waive the payment of each premium which thereafter becomes due for as long as the period of disability lasts.
 Manifestly, the issue of whether Sebastian is entitled to a waiver of premiums for 1994 and 1995 turns on the same issues discussed in text as to "total disability."

April 30, 1994; for the month of May 1994, he was required to give written proof of loss within 90 days of May 31, 1994, and so on.

It is undisputed that Sebastian did not submit an appropriate notice of claim or proof of loss until October 1995. Sebastian asserts that his filings were timely and that, even if he missed the 20- and 90-day time limitations, he still complied with the requirements of the policy because both written notice of claim and proof of loss were submitted *as soon as was reasonably possible*. He asserts further that even if the notice and proof of loss were not submitted timely, Provident is not entitled to judgment as a matter of law because Provident has failed to produce sufficient evidence to show that it was prejudiced by the delay.

█ It is well settled in Pennsylvania that a policyholder's timely satisfaction of notice of claim and proof of loss requirements are conditions precedent to an insurer's liability for benefits under an insurance policy. *See Equitable Life Assur. Soc. of U.S. v. McCausland*, 331 Pa. 107, 111, 200 A. 85 (1938)("Where a policy of life insurance provides that disability benefits will be payable upon receipt of proof that the insured has become totally and permanently disabled, and that the payment of all premiums falling due after the receipt of proof and during the continuance of such disability will be waived, the furnishing of the proof of disability is a condition precedent."); *Ercole v. Metropolitan Life Ins. Co.,*, 155 Pa.Super. 549, 551, 39 A.2d 293 (1944)("Those preliminary steps or conditions precedent are uniformly required before a claim for benefits is recognized as valid.").

Having considered the parties' contentions, and for the reasons explained below, I am satisfied, notwithstanding Provident's arguments, that the timeliness of Sebastian's compliance with the notice of claim requirement presents a jury question. Furthermore, I am persuaded that, as a matter of law, provided the jury finds that Sebastian had been continuously totally disabled at the time he filed his proof of loss in October 1995, such filing was timely.

### 1. Notice of Claim

Provident's expert, Dr. Blumberg, testified that it was reasonably possible for Sebastian to submit the notice of claim at any time during the period January 1, 1994 through August 1, 1995. Sebastian contends, however, that his mental illness prevented him from filing the notice of claim sooner than October 1995. He speaks of how he was unaware that his illness was so severe, how he eventually sought psychiatric help, and how he was mentally incapable of dealing with the fact that he could no longer function on his own and needed help.

█ Dr. Blumberg's opinion regarding Sebastian's ability to submit notice is based largely if not entirely on his view that Sebastian has not been properly diagnosed and is actually suffering from a less severe mental ailment than bipolar affective disorder. Dr. Blumberg states in his declaration that "[t]here is no indication in the medical records ... that Sebastian was so impaired that he would have been unable to submitted [sic] notice of a claim [and proof of loss] to Provident between January 1, 1994 and August 1, 1995. Although he may have suffered from occasional insomnia, anxiety and depression, there is no indication that his symptoms were of such severity that they precluded him from any significant activities." Blumberg Decl. at ¶¶ 7, 8. Provident relies solely on Dr. Blumberg's testimony to establish that Sebastian failed to meet the conditions precedent. This, however, is not such irrefutable evidence as to warrant summary resolution of this issue.

█ To the contrary, a disputed issue of material fact remains for resolution. Dr. Blumberg's evaluation of the severity and complexity of Sebastian's condition conflicts with Dr. Cohn's diagnosis and evaluation of Sebastian. Moreover, other wit-

nesses observed that Sebastian had more severe problems than Dr. Blumberg would identify during the period. Dr. Gorrie certainly evaluated Sebastian as mentally and physically debilitated. Although Bradley, Brogan, and James Jr., are not physicians or psychologists, they either personally observed Sebastian or were familiar with what was occurring with his mental functioning during this period. They expressed the view that Sebastian lacked the ability to carry on any activities for himself. Thus, a genuine issue as to Sebastian's mental condition is generated, and the jury could reasonably find that Sebastian's notice of claim was timely submitted because it was submitted *as soon as it was reasonably possible*, in light of the circumstances surrounding his psychiatric disorder.[5]

### 2. Proof of Loss

 Provident's interpretation of when Sebastian was required under the terms of the policy to submit a proof of loss—within 90 days of each month of disability, as contrasted with once, within 90 days of the termination of his *continuing period of disability*—flies in the face of well-reasoned case law in Pennsylvania. In *Hofkin v. Provident Life & Acc. Ins. Co.*, 81 F.3d 365 (3rd Cir.1996), the Third Circuit construed language in a provision of a Provident policy which is virtually identical to that involved here, which it noted is statutorily-mandated language appearing in all proof of loss provisions contained in policies delivered in Pennsylvania. The underlying statutory provision reads as follows:

Proofs of loss. Written proof of loss must be furnished to the insurer at its said office in case of claim for loss for which this policy provides any periodic payment contingent upon continuing loss within ninety days after the termination of *the period for which the insurer is liable* and in case of claim for any other loss within ninety days after the date of such loss. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

Pa. Stat. Ann. tit. 40, § 753(A)(7)(emphasis added). The court construed the phrase "the period for which the insurer is liable" to mean that the insured need only submit a proof of loss within 90 days following the entire length of an ongoing period of disability, and not within 90 days of each month during a period of continuing disability, notwithstanding the insurer's payment of monthly benefits. *Hofkin*, 81 F.3d at 374 (collecting cases from around

---

5. Sebastian contends that Provident must demonstrate that it was prejudiced by any delay in the submission of the notice of claim. He relies primarily on *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977).

In *Brakeman*, the Pennsylvania Supreme Court held that under a motor vehicle liability insurance policy containing language that required the insured to submit written notice to the company "as soon as practicable," the insurance company must prove "not only that the notice provision was breached, but also that it suffered prejudice as a consequence." *Brakeman*, 472 Pa. at 72, 371 A.2d 193; *see also Clark v. State Farm Auto. Ins. Co.*, 410 Pa.Super. 300, 599 A.2d 1001 (1991). The rationale underlying the court's decision is that an insurance contract is a contract of adhesion—"its conditions are by and large dictated by the insurance company to the

insured." 472 Pa. at 73, 371 A.2d 193. Generally, insurance policies contain identical policy language. Thus, leaving insureds with little variety in notice provisions from which to choose. *Id.* Additionally, the court noted that requiring the insurer to show prejudice is also appropriate where an insurance company has accepted premiums for insurance coverage and then seeks to deny coverage on the ground of late notice. *Id.* The court stated "[w]e are reluctant, therefore, to allow an insurance company to refuse to provide that which it was paid for unless a sound reason exists for doing so." *Id.* at 74, 371 A.2d 193.

*Brakeman* clearly applies to the notice of claim provision at issue in this case. *See Block v. Doubletree Hotels Corp.*, 5 F.Supp.2d 321, 323 (E.D.Pa.1998)(applying *Brakeman*'s prejudice rule to notice of claim provision of disability policy).

the country, and noting that its construction of the statutory language on which the policy language was based was in accord with the vast majority of courts having passed on the issue).

Provident argues that I should reject the *Hofkin* analysis because such a construction of the language is contrary to the plain and unambiguous language of the statutorily mandated proof of loss provision. I am not persuaded to reject the Third Circuit's view, which is plainly the view of the majority of courts.[6] Accordingly, I adopt the *Hofkin* approach, under which, as a matter of law, provided the jury finds he was continuously totally disabled as of the time he filed his proof of loss, Sebastian submitted his proof of loss in a timely fashion. *Id.*

**D. Reimbursement of Rehabilitation or Medical Expenses**

 Sebastian requests reimbursement for the funds he expended to cover his visits to Drs. Hankin and Cohn, and Mercy Psychiatry Associates, P.C. He is also claiming reimbursement for expenditures for prescription medications. It is clear, however, that the expenses for which Sebastian seeks reimbursement are not covered under the insurance policy.

The policy provides in pertinent part:

**REHABILITATION**

If, during a period of Total Disability, you participate in a program of occupational rehabilitation which we approve, we will pay for the reasonable expenses you incur for training and education. But, we will not pay more than the Maximum Amount for Rehabilitation Expenses shown on Page 3.

A program of occupational rehabilitation must be designed to help you return to work and be:

1. a formal program of rehabilitation at an accredited graduate school, college or business school, or at a licensed vocational school:

2. a recognized program operated by the federal or a state government; or

3. any other professionally planned rehabilitation program of training or education.

**TREATMENT OF INJURIES (PAYABLE IF DISABILITY BENEFITS NOT PAID)**

If Injuries require medical treatment prescribed by a Physician, we will pay your expenses for the treatment. But, we will not pay more than the Maximum Amount for Treatment of Injuries shown on Page 3 as a result of any one accident.

Sebastian has not presented even a scintilla of evidence tending to establish that he participated in a program of occupational rehabilitation or that he participated in any program that was approved by Provident. The expenses he seeks to recover are medical expenses, pure and simple. The policy lists the types of programs covered and specifically states that the programs covered "must be designed to help you return to work" and the expenses that are reimbursable are "the reasonable expenses you incur for training and education."

Moreover, there is no evidence that the psychotherapy services and medications were treatment for "injuries." "Injuries" is defined in the policy as "accidental bodily injuries occurring while this policy is in force." It is undisputed that Sebastian suffered from a psychiatric disorder and not from an "accidental bodily injury." For these reasons, Provident is entitled to judgment as a matter of law on Sebastian's

---

6. The proof of loss provision in this case is slightly different than the statutory provision construed in *Hofkin*. In the policy involved in the case at bar, the clause "period for which we are liable" is preceded by the word "each." Provident, however, does not argue that its addition of the word "each" gives a different meaning to the provision, perhaps because it failed to obtain the approval of the Pennsylvania insurance authorities before it effected such change. *See Hofkin*, 81 F.3d at 374. In any event, as a matter of law, a continuous period of disability constitutes a single "period for which [Provident] is liable." *Id.*

claim for reimbursement of rehabilitation and medical expenses.

### E. Remaining Issues

There remain three issues raised by Sebastian in support of his motion for summary judgment. First, he contends that Provident cannot recover benefits already paid under the policy, nor obtain a declaratory judgment voiding the policy, because there is no provision in the policy reserving to Provident a right to recover any benefits it has paid under the policy, or which explicitly authorizes rescission. Second, Sebastian contends that, as a matter of law, Provident lacks evidence sufficient to establish that he made false statements or misrepresentations regarding his inability to work in order to obtain benefits. Third, Sebastian contends that Provident should be estopped from denying coverage on the ground that it determined that he was totally disabled and paid him benefits from August 1, 1995 through July 2, 1998. Close examination of these contentions reveals that none of them vitiates Provident's counterclaim.

■ There is no dispute that the policy does not contain any provision explicitly granting Provident the right to recover benefits paid under the policy or a rescission remedy; however, such a provision is not necessary. Under Pennsylvania law " '[i]nsurance contracts are presumed to have been made with reference to substantive law, including applicable statutes in force, and such laws enter into and form a part of the contractual obligation as if actually incorporated into the contract.' " *Groff*, 741 F.Supp. at 550 (quoting *Clairton City School Dist. v. Mary*, 116 Pa.Cmwlth. 376, 541 A.2d 849, 851 (1988)). Maryland law is to the same effect. *See Denice v. Spotswood I Quinby, Inc.*, 248 Md. 428, 433–34, 237 A.2d 4, 7 (1968); *Dept. of Gen. Servs. v. Harmans Assoc. L.P.*, 98 Md. App. 535, 550, 633 A.2d 939, 947 (1993).

Under both Pennsylvania and Maryland law an insurer may "recover payments made to an insured under a mistake of fact or as a result of fraud or misrepresenta-

tion." *Home for Crippled Children v. Prudential Ins. Co.*, 590 F.Supp. 1490, 1506 (W.D.Pa.1984). *See also Van Riper v. Equitable Life Ass. Soc.*, 561 F.Supp. 26, 33–34 (E.D.Pa.1982), *aff'd*, 707 F.2d 1397 (3rd Cir.1983); *Korpa v. Stuyvesant Life Ins. Co.*, 236 Pa.Super. 581, 351 A.2d 682 (1975)("[T]he fact remains Stuyvesant has paid a claim for which it was not liable due to erroneous information being supplied to it. Since Stuyvesant relied on erroneous information provided it by the plaintiff and paid a claim for which it had no liability, relying on good faith on an application on its face, we find that a compulsory nonsuit was wrongfully entered against Stuyvesant on its claim against the plaintiff."); *Admiral Ins. Co. v. American Nat'l Sav. Bank F.S.B.*, 918 F.Supp. 150 (D.Md. 1996)("[T]he overwhelming weight of persuasive authority dealing with private insurance contracts indicates that the erroneous payment by an insurer of amounts claimed under an insurance policy constitutes a mistake of fact which permits recovery of the amounts paid under a theory of restitution.")(predicting the course that Maryland courts are likely to take when confronted with the issue). *Cf.* Francis M. Dougherty, Annotation, *Right of Insurer Under Automobile Insurance Policy to Restitution of Payments Made Under Mistake*, 37 A.L.R.4th 1048 (1981). Accordingly, Provident has a claim upon which the court may grant the relief requested. If the jury draws the inferences urged by Provident in connection with the XLS evidence, it could reasonably conclude that Sebastian defrauded Provident of the disputed benefit payments. In sum, the issues critical to resolution of Provident's counterclaim are not ripe for summary adjudication.

■ Finally, the above discussion disposes of Sebastian's estoppel contention. It is plain that liability for the injury inflicted upon an insurer through an insured's knowingly fraudulent misrepresentations, made for the purpose of obtaining benefits not otherwise payable under a

policy of insurance, may not be avoided because the misrepresentations go undiscovered for a period of time. *See Korpa,* 236 Pa.Super. at 585, 351 A.2d 682 ("The problem with this reasoning is that the fraud or misrepresentation, if any existed, was committed by [the insured] and not [the insurer]."). There is no estoppel here.

## VI. Conclusion

In accordance with the views set forth above, I conclude as a matter of law that Sebastian did not receive "appropriate care" during the period January 1, 1994, through April 11, 1994, and therefore is not entitled to benefits for that period, and that Sebastian did not incur rehabilitative or medical expenses as those terms are defined by the insurance policy. I further conclude as a matter of law that, should the jury find that Sebastian was continuously disabled during any period of time up to and including October 1995, then he submitted a timely proof of loss as required by the policy of insurance and in accordance with applicable Pennsylvania law. In all other respects, the motions for summary judgment shall be denied.

### ORDER

In accordance with the foregoing Memorandum, it is this 27th day of September, 1999, by the United States District Court for the District of Maryland, ORDERED

(1) That THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT (PAPER NO. 57 ) IS GRANTED IN PART AND DENIED IN PART; and it is further ORDERED

(2) That THE MOTION FOR SUMMARY JUDGMENT FILED BY PLAINTIFF (PAPER NO. 59) IS DENIED; and it is further ORDERED

(3) That this case is calendared for a 3–4 day jury trial during the two week period beginning Tuesday, January 18, 2000, with a pre-trial conference to be held on Friday, January 7, 2000, at 3:00 p.m.; and it is further ORDERED

(4) That the Clerk shall TRANSMIT a copy of this Order to counsel.